Case 3:04-cv-04981-WHA   Document 535   Filed 01/12/06   Page 1 of 19

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARGIE CHERRY and ESTORIA CHERRY,
on behalf of themselves and all others similarly
situated,

    Plaintiffs,

  v.

THE CITY COLLEGE OF SAN FRANCISCO
("City College") LAWRENCE WONG, in his
official capacity as President of the Board of
Trustees, MILTON MARKS, III, in his official
capacity as Vice-President of the Board of Trustees,
DR. NATALIE BERG, JOHNNIE CARTER, JR.,
DR. ANITA GRIER, JULIO J. RAMOS, RODEL
E. RODIS, in their official capacities as members
of the Board of Trustees, and DR. PHILIP R. RAY,
JR., in his official capacity as Chancellor,

    Defendants.
_____/

No. C 04-04981 WHA

**ORDER RE SUMMARY
JUDGMENT MOTIONS**

## INTRODUCTION

In this class action involving mobility-impaired students, the basic question is to what extent, if at all, the City College of San Francisco has violated federal statutes requiring that its new structures meet access guidelines and that it make its programs and services readily-accessible for the disabled. This order resolves issues of federal law dividing the two sides.

**STATEMENT**

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, imposed on recipients of federal assistance, such as the city college sued in this action, an obligation to remove all architectural barriers preventing the disabled from participation in the grant recipient's programs or activities. Pursuant to implementing regulations issued by the former Department of Health, Education and Welfare, "new" construction after the effective date of June 3, 1977, was required to be designed and constructed in such a manner that the facility was "readily accessible to and usable" by disabled persons. 45 C.F.R. 84.23 (1977). Design and construction in accordance with the American National Standards Institute Standard A117.1–1961 (R 1971) or substantially equivalent standards were permissible. *Ibid*. Effective 1991, the ANSI standard was superseded by the Uniform Federal Accessibility Standard (UFAS). 55 Fed. Reg. 52136 (Dec. 19, 1990).

On the other hand, buildings and facilities begun before June 3, 1977, were deemed "existing." They were not required to be made accessible so long as the recipient operated its programs or activities, when viewed in their entirety, so as to be "readily accessible" to disabled persons. 45 C.F.R. 84.22 (1977). A recipient was allowed to comply via programmatic "methods." Among others, one method mentioned in the regulations was "reassignment of classes or other services to accessible buildings." Again, a recipient was not required to make structural changes in existing facilities when other methods were effective in providing "readily accessible" programs and services. In choosing among methods, however, it was required to give priority to those methods that offered programs and activities to disabled persons "in the most integrated setting appropriate." *Ibid*. Finally, when and if any "existing" building (existing or under construction as of June 3, 1977) was "altered," the part altered was to be changed, "to the maximum extent feasible," so as to be readily accessible. 45 C.F.R. 84.23(b) (1977).[1] In substance, the Section 504 regulations established two types of

---

[1] The Civil Rights Restoration Act of 1987, 20 U.S.C. 1687, overturned court rulings that had limited Section 504 to the specific program being funded. *All* programs and activities of the grant recipient are now covered.

2

possible violations: a "facilities" violation as to new construction and a "program" violation as to existing structures.

Section 504 and its implementing regulations remain in effect today. The relevant agency, for our purposes, is now the Department of Education. Its regulations appear at 34 C.F.R. Part 104 (2005).

\*     \*     \*

With minor differences, these reforms were extended to all "public entities" by Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12101, 12131. Title II provided:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. 12132.

The ADA required the Attorney General to promulgate regulations to implement Title II. 42 U.S.C. 12134. The regulations were promulgated in 1991. They first appeared at 28 C.F.R. Part 39 (1991). Today, they appear at 28 C.F.R. Part 35 (2005). The regulations apply to all public entities, whether or not they receive federal grants. (Thus, both the Section 504 regulations and the Title II regulations apply in this case.)

In most ways here relevant, the implementing Title II regulations tracked the earlier regulations under Section 504. Section 35.149 stated:

> Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

28 C.F.R. 35.149 (2005).

The existing-versus-new regime was carried forward but with a definitional divide of January 26, 1992. With respect to "new" construction, each facility or "part of a facility" constructed after January 26, 1992, was required to be "designed and constructed in such a manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities . . . ." 28 C.F.R. 35.151(a).

3

Two safe harbors were identified. Compliance with either UFAS or the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), about which more will be said, was "deemed to comply" with the regulations. Since this language is critical in these motions, the section deserves to be quoted in full:

> *Accessibility standards.* Design, construction, or alteration of facilities in conformance with the Uniform Federal Accessibility Standards (UFAS) (Appendix A to 41 CFR part 101-19.6) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) (Appendix A to 28 CFR part 36) shall be deemed to comply with the requirements of this section with respect to those facilities, except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of ADAAG shall not apply. *Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.*

28 C.F.R. 35.151(c) (2005) (emphasis added). This order italicizes the last sentence because it is central to the analysis below.

As for "existing" facilities, *i.e.*, in place or under construction before January 26, 1992, the ADA regulations again tracked the Section 504 regulations. Concerning existing facilities, Section 35.150 provided that a public entity must operate each service, program or activity so that when viewed in its entirety, it is "readily accessible to and usable by individuals with disabilities." It hastened to add that this requirement did "not necessarily" require a public entity to make each of its existing facilities accessible. Nor did it require any action that would threaten the historic significance of a structure or that would result in a "fundamental alteration" in the nature of the service, program or activity. As with the Section 504 regulations, with respect to "existing" buildings, the entity could comply through programmatic "methods":

> *Methods* — (1) *General*. A public entity may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible buildings, assignments of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility

4

> requirements of § 35.151.  In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

28 C.F.R. 35.150(b).

Thus, as with Section 504, a college using some old and inaccessible buildings was allowed to comply by holding all courses with disabled students in new and accessible buildings, to take only one example.  If structural changes were required in any existing buildings, the changes were to be made within three years of the effective date of the regulations.

As stated, the Attorney General was charged with promulgating Title II regulations. They were to include "standards applicable to facilities . . . covered by" Title II and were to "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board.  In turn, the Board was tasked with issuing "minimum" guidelines to supplement the "existing Minimum Guidelines and Requirements for Accessible Design" (MGRAD).  42 U.S.C. 12134(c), 12204(a).[2]

These minimums were ADAAG, issued by the Board simultaneously with the adoption of the Title II regulations by the Department of Justice in 1991.  56 Fed. Reg. 35408, 35694 (July 26, 1991).  That these were intended as the "minimums" desired by Congress appears at page 35411 of volume 56 of the Federal Register.  *See also* 63 Fed. Reg. 2000 (Jan. 13, 1998); 69 Fed. Reg. 44084 (July 23, 2004); *Paralyzed Veterans of America v. Ellerbee Becket Architects & Engineers, P.C.*, 950 F. Supp. 389, 391 (D.D.C. 1996).  As a general statement, it can be said that ADAAG and UFAS are more alike than different, but they are not identical.

The Board has issued a number of supplements to ADAAG.  Most of the supplements have *not* yet been adopted by the Department of Justice as part of the Title II regulations. *See* 69 Fed. Reg. 58769 (Sept. 30, 2004).  Put differently, only revisions of ADAAG actually incorporated into the Title II regulations have the force of law.

---

[2] The Board was created under Section 502 of the 1973 Rehabilitation Act, 29 U.S.C. 792.  Its purpose was to assist in designing access standards.  The Board developed MGRAD to assist federal agencies in establishing federal access standards.  In turn, the agencies developed UFAS.  *See* 56 Fed. Reg. 35408, 35409 (July 26, 1991).

5

In 1993, the Department of Justice issued further guidance interpreting its own regulations. The guidance is called "The Americans with Disabilities Act Title II Technical Assistance Manual." The Ninth Circuit has held that this manual must be given substantial deference in interpreting the department's regulations unless the manual is plainly erroneous or inconsistent with the regulations. *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 n.11 (9th Cir. 1999). It will be referred herein as the "DOJ Manual." For its part, the Office for Civil Rights in the Department of Education further issued a paper to guide public elementary and secondary schools entitled "ADA Compliance with the Americans with Disabilities Act" in 1996. It will be referred to herein as the "OCR Manual."

\*       \*       \*

On June 15, 2005, the Court certified the following plaintiff class:

> All students disabled by mobility impairments enrolled at City College of San Francisco since November 23, 2001, and who seek access to its services, programs and/or activities.

A class was certified solely for injunctive and declaratory relief. The order did not certify the issue of damages for class treatment. Estoria Cherry, the class representative, has waived her individual damages claim, as has her mother, co-plaintiff Margie Cherry. Trial is set for February 14, 2006.

## ANALYSIS

This order now resolves various issues of law raised by the parties.

**1.    NEW FACILITIES.**

As to "new" construction, the parties differ sharply over whether a public college must adhere "strictly" to either UFAS or ADAAG or be in violation of Title II. The parties refer to this as the "strict liability" issue. Plaintiffs contend that a quarter-inch variance on a sixty-inch specification, for example, is a violation. Indeed, plaintiffs contend that they need not even prove the extent of any shortfall and need only prove that the on-the-ground measurement is "less than" the applicable standard.

6

After much reading and study, the Court will find its own way, not adopting either side's extreme view of the law. Except perhaps in the limited way described below, there is no such thing as "strict liability." There are two main reasons.

*First*, the rule of equivalent facilitation stands in the way of any strict liability. The ADA regulations themselves merely state that compliance with UFAS or ADAAG "shall be deemed" to be compliance with respect to the requirement of Section 35.151. Contrary to plaintiffs, those standards are not called out as the only way to comply. The regulations state:

> Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

28 C.F.R. 35.151(c) (last sentence). Over and again, plaintiffs have refused to acknowledge in their argument that this sentence is in the regulation (Br. 10–13).

Similarly, the DOJ Manual notes that "departures from particular standards are permitted where alternatives will provide substantially equivalent or greater access" (§ II-6.3100(2)). ADAAG itself states:

> Departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility.

28 C.F.R. Part 36 App. A § 2.2.

While UFAS does not contain a similar "equivalent facilities" proviso, the Section 504 regulations so provide, as do, as already stated, the ADA regulations. 34 C.F.R. 104.23(c). In sum, ADAAG and UFAS are safe harbors for full compliance. Sailing outside these harbors puts a ship at risk but does not necessarily sink it. Substantial equivalence may allow clear sailing.

*Second*, ADAAG states (at Section 3.2) that "[a]ll dimensions are subject to conventional building industry tolerances for field conditions." UFAS has a similar proviso. 41 C.F.R. Subpart 101-19.6 App. A at § 3.2. This is intended to allow for construction tolerances, such as variations based on field, material, manufacturing and workmanship conditions. *See Access*

7

*Now, Inc. v. Ambulatory Surgery Center Group, Ltd.*, No. 99109 Civ, 2001 WL 617529 at *3 (S.D. Fla. May 2, 2001). In the cited decision, the parties even agreed that a construction tolerance of one unit from a dimension such as 18 units was reasonable. (Any such allowance here would, of course, either have to be litigated or stipulated.)

The law is sparse on the allocation of the burden of proof on these issues. The easier issue concerns equivalent facilitation. Since the regulations themselves state that equivalence must be "clearly evident," the entity should bear the burden of proof on this issue. The harder issue concerns tolerances for field conditions. To be sure, placing the burden on the party who wishes to deviate has some superficial appeal. On balance, however, this order holds that the ADA/§ 504 plaintiff bears the burden to show that the asserted discrepancy exceeds the conventional building industry tolerance for field conditions. The main reason is that the standards expressly include such tolerances as part of the dimensional specifications themselves. To say that a mirror is hung too high by a quarter of an inch does not, by itself, prove a violation, for the standards themselves allow for variances. This is sufficient. Another reason exists, however, and is illustrated by this very record. Plaintiffs have asserted a long punch list of 4168 alleged violations. In many cases, the list does not tell us by how much; it could be a mere quarter of an inch, as defendants allege is often the case. While many are more serious, at least some appear to be minor shortfalls. If small discrepancies are going to be used to prove liability and to consume trial time for several weeks, then plaintiffs should bear the burden of showing, at the threshold, that the discrepancies exceed acceptable tolerances. Once a discrepancy is shown to exceed the acceptable tolerance, however — even if only slightly, a violation will have been proven absent an affirmative showing by the defense of substantial equivalence.

It is true that Magistrate Judge Ashmanskas, in a single sentence in a very long order, ruled the other way in *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 782 (D. Ore. 1997), as to the deviation/allowance issue. But no reasoning was supplied, only *ipse dixit*. It is also true that our defendants here seem willing to bear the deviation/allowance

8

burden anyway. This order, however, will state the law as the Court has determined it should be applied to all public entities.[3]

In sum, the burden is on plaintiffs to prove that the variance exceeds the allowed tolerance. It is not enough to simply show that a particular bathroom stall, for example, is "less than" the required width. The approximate *extent* of any shortfall must be proven. And, the dimensional tolerance at the time of construction must be proven. If it turns out, as contended, that many of the shortfalls are only a quarter of an inch (versus, say, a sixty-inch dimension), then such a small variance would presumably fall within construction tolerances, although that would be a matter of proof. The point is that plaintiffs, having the burden of proof, must show that the variance exceeds the allowance. *To do so, they must prove the relevant ADAAG/UFAS specification, the actual dimension on the ground, and the range of acceptable tolerances at the time of construction.* With this evidence, we can then determine whether or not the relevant standard, taking into account the allowed tolerances, has been violated.

With respect to the issue of "equivalent facilitation," the defense must bear the burden of showing that any alternative clearly provides substantially equivalent or better access. For example, if the standard calls for a bathroom stall of 25 square feet but the actual is only 20 square feet, there can be no "substantially equivalent access," at least without some compensating design feature. The specifications and dimensions in ADAAG are "minimums." As stated, Congress empowered the board that issued ADAAG to issue "minimum guidelines" and charged the Attorney General to adopt standards consistent therewith. 42 U.S.C. 12134(c), 12204(a). Thus, the Board and the Attorney General have already set the minimum specifications in ADAAG.

A more cramped facility that simply provides less space than called for by ADAAG (or UFAS as the case may be), without a compensating accessibility benefit, cannot, by

---

[3] In *United States v. AMC Entertainment, Inc.*, 245 F. Supp. 2d 1094 (C.D. Cal. 2003), Judge Cooper refused to allow for building industry tolerances because the defendant had provided no expert evidence on the subject. This impliedly held that the burden was on the defendant. The reason given was that the ADAAG standards were minimums. Recognizing allowances for field conditions, the order stated, would pare down the minimums. This order disagrees. While ADAAG sets forth minimum clearances, it also states that any variances within industry tolerances is part of the minimum itself.

9

1    definition, be substantially equivalent or otherwise be found to be in compliance.  The ADAAG
2    preamble contemplated that the equivalent alternatives would be a "design" or a "technology,"
3    *i.e.*, an improvisation that does as well or better.  A creative design that addresses the problem in
4    a different way, such as via new technology not existing when ADAAG was adopted, among
5    other possibilities, might well be shown to offer substantially equivalent (or greater) access.
6    ADAAG, however, did not bless half measures.  *See* 56 Fed. Reg. 35413 (col. 1–2).

7    A college or other public entity can follow either ADAAG or UFAS (for construction
8    and alteration after January 26, 1992).  For any given new construction or alteration, it must
9    follow *one or the other*.  Departures from the selected standard must provide the substantially
10   equivalent or better access, even if, for example, the departure is a departure from ADAAG
11   generally to borrow a particular UFAS specification.  56 Fed. Reg. 35710 (col. 3); DOJ Manual
12   at § II-6.2100.  This means that in discovery, a plaintiff should learn, as to each facility, whether
13   the entity adopted ADAAG rather than UFAS as the bench-line.  Then, the adopted baseline
14   must be the benchmark for evaluating a claim of equivalent facilitation.  If ADAAG is the
15   baseline chosen for a building, a UFAS specification can be followed on a particular and
16   occasional feature if it provides substantially equivalent access to the ADAAG analogue.
17   An entity, however, cannot mix and match ADAAG and UFAS so as to give the disabled the
18   worst of both worlds.

19                                    *       *       *

20   Plaintiffs' so-called "strict liability" theory, rejected by this order, simply pretends that
21   the "equivalent facilitation" option is not even in the regulations.  The key sentence in the
22   regulations — italicized above — is *never* mentioned in plaintiffs' written argument in support
23   of its motion (Br. 10–13).  Worse, through clever use of brackets in quotes, plaintiffs' counsel
24   have portrayed the regulations as providing for only two options (ADAAG or UFAS) rather than
25   three options (ADAAG, UFAS or equivalent facilitation).  Here are some disturbing examples
26   from their memorandum:

27   •       A Tenth Circuit decision cited by plaintiffs' counsel (Br. 10)
28           actually held that the alterations had to "comply with either the

10

ADAAG or the UFAS, *or else provide clearly equivalent access to the altered facility*" (emphasis added). In their quotation, however, plaintiffs' counsel left out the italicized language and truncated the quote to "either the ADAAG or the UFAS."

- An Eighth Circuit decision quoted by plaintiffs' counsel (Br. 10) actually stated that the public entity must make "the building accessible to individuals with disabilities in accordance with 28 C.F.R. 35.151." Plaintiffs' brief, however, took out "28 C.F.R. 35.151" which, of course, includes the equivalent-facilitation option. Using brackets, counsel substituted in its place "[ADAAG or UFAS]." The result thus read ". . . in accordance with [ADAAG or UFAS], leaving the false impression that these are the only two lawful options.[4]

- Similarly, the DOJ Manual actually recognized the equivalent-facilitation option several times (§ II-6.3100(2)). But, once again, plaintiffs' counsel employed artful brackets to leave a false impression, stating in the brief (Br. 10) that the DOJ Manual held that a new facility "must be designed [and] constructed . . . in strict compliance with [ADAAG or UFAS]." Actually, what it stated was that "the facility must be designed, constructed, or altered in strict compliance *with a design standard*" (emphasis added). The manual went on to provide for the two standards as well as for equivalent facilitation.

---

[4] The decisions referenced are *Chaffin v. Kansas State Fair Board*, 348 F.3d 850, 860–69 (10th Cir. 2003), and *Layton v. Elder*, 143 F.3d 469, 473 (8th Cir. 1998). Both decisions, especially *Chaffin*, refer to the substantial latitude afforded public entities and to the concept of equivalent facilitation.

11

This studied effort to turn day into night is a disappointment to the Court. A judge does not have the resources to vet everything submitted in all briefs. Counsel must try harder, as officers of the court, to provide trustworthy assistance.

Plaintiffs' counsel also invoke an unpublished order in *Lopez v. The San Francisco Unified School District*, Action No. C-99-03260 SI (N.D. Cal. 2004). That order's use of the phrase "strictly comply," however, meant only that *if* an entity purports to use ADAAG (or UFAS, as the case may be), *then* it must "strictly comply" with that specification (which, as stated, expressly includes dimensional tolerances). The order did not even address the equivalent-facilitation alternative. Therefore, the quoted phrase cannot reasonably be understood to have read the equivalent-facilitation alternative out of the regulations or out of the DOJ Manual. Indeed, the order was based on the DOJ Manual. Since the DOJ Manual embraced the equivalent-facilitation alternative, there is reason to believe that the judge in *Lopez* would have done so as well had the issue been presented. The *Lopez* order does not aid plaintiffs' strict-liability argument.

\* \* \*

In the opposite direction, the college contends that the governing rule is only that new facilities need only be "designed and constructed in such a manner that the facility . . . is readily accessible to and usable by individuals with disability." So long as this general test is met for new construction, the college contends that neither ADAAG nor UFAS nor even equivalent facilitation need be met. These are mere safe harbors for assured compliance, it states. The problem with this argument is that ADAAG/UFAS, while safe harbors, are *minimums* for new construction. If *less* access is provided, then the minimum is violated for new construction. Only when there is no ADAAG/UFAS criterion for a given design feature may we default to the general test. *See* OCR Manual at 173 (playground example). When there is an ADAAG/UFAS criteria, then it is used as the benchmark for equivalent facilitation. Defendants' argument is rejected.

\* \* \*

12

Another issue concerns inaccessibility due to chairs, trash cans, potted plants, filing cabinets and other furniture intruding upon the required clearance. Such interruptions are violations unless the obstruction is temporary or isolated. Any blockage beyond a reasonable period of time is actionable. 28 C.F.R. 35.133 (2005); OCR Manual at 174–75. The burden is on plaintiffs, however, to show that the blockage is persistent.[5]

### 2. 1977–1992 CONSTRUCTION.

It is true, as the college asserts, that facilities constructed before January 26, 1992, are deemed "existing" under Title II. But under Section 504, all facilities constructed after June 3, 1977, are deemed "new." This means that facilities commenced from June 3, 1977, to January 12, 1992, are deemed "new" under Section 504, regardless of their status under the ADA. Contrary to defendants, Title II did not turn back the Section 504 clock. No authority is cited for the astonishing defense notion that fifteen years of operation of Section 504 were erased by Title II. The authority is to the contrary. *See* OCR Manual at 157, 172 ("a public entity covered under both Title II and Section 504 could operate a facility that would be an *existing* facility under Title II and yet constitute *new construction* under Section 504"). *Accord:* OCR Senior Staff Mem. (Dec. 1, 1992) 19 IDELR 694 (1993).

Facilities deemed new only under Section 504, however, must be judged only by Section 504 standards. This was the ANSI standard from 1977 until 1991. In that regard, the Department of Justice has taken the position that compliance with ADAAG is compliance under Section 504. OCR Manual at 171; OCR Senior Staff Mem. (Dec. 1, 1992) 19 IDELR 694 (1993).

### 3. EXISTING FACILITIES.

With respect to "existing" facilities, this order holds that ADAAG/UFAS, although advisory only as to existing facilities, may be considered in determining the extent of physical

---

[5] Even if a violation were adjudicated for purposes of damages and/or declaratory relief, an *injunction* might not issue to alter physical facilities. The scope of mandatory injunctive relief involves a complex of factors, including cost versus benefit, comparative options and equities. *See, e.g., Long v. Coast Resorts, Inc.*, 267 F.3d 918, 923 (9th Cir. 2001); *Indep. Living Resources v. Oregon Arena Corp.*, 1 F. Supp. 2d 1124, 1150–51 (D. Ore. 1998); *Parr v. Kapahulu Invs., Inc.*, No. Civ. 98-00329, 2000 WL 687646 at *20 (D. Haw. May 16, 2000). This order, however, pertains to the issue of violation. The issue of remedy would arise only after a violation is determined.

13

and architectural barriers. It is true that the larger picture and entire integrated setting must be considered and that programmatic cures may ameliorate the presence of physical barriers. But it is still important for the fact-finder to weigh the extent of inaccessibility posed by older structures. In that inquiry, the guidelines can illuminate the landscape. OCR Manual at 160; *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 226 (S.D. N.Y. 1999). But other less stringent guidelines, perhaps the ANSI guidelines, may also provide guidance as well. All can be considered.

Insofar as "existing" structures are concerned, the ultimate trial inquiry will be whether the activities, services and programs, viewed in their entirety, are "readily accessible to and usable" by the disabled class members. The focus will be on the overall activity, service or program, not on the buildings and pathways alone. The burden will be on plaintiffs to prove that entire mix of circumstances, including the programmatic cures, such as holding classes desired by the disabled in accessible facilities, is inadequate.

So long as the "readily accessible/usable" standard is met, moreover, no court or jury should second-guess the particular combination of methods used by the school to achieve the required level of accessibility. Again, defendants are correct that "existing" facilities need not be retrofitted and upgraded so long as other adequate programmatic cures are in place. (In contrast, programmatic cures cannot prevent violations as to new construction.)

### 4. ALTERATIONS TO EXISTING FACILITIES.

Each alteration to an existing facility must comply with the provisions relating to new construction — but only to the extent of the altered portion of the facility and only to the extent that it is feasible. Plaintiffs' submission seems to proceed on the assumption that any partial alteration triggers a federal duty to renovate the entire building. This is not the law.

### 5. SUMMARY OF TITLE II RULINGS.

In summary, the burden of proof is always on an ADA/§ 504 plaintiff. An ADA/§ 504 plaintiff may proceed by way of proving "facilities violations" and/or by way of proving "program violations."

14

To prove a facilities violation, an ADA/§ 504 plaintiff must prove (i) that the facility was built or altered after January 26, 1977; (ii) the applicable standard and specifications at the time of construction or alteration; (iii) the actual, on-the-ground measurements, and (iv) the conventional building industry tolerances for field conditions at the time of construction or alteration. Plaintiff must prove that the variance exceeds the allowance. With respect to any issue of equivalent facilitation, the burden is on the entity to prove any alternative is "clearly" substantially equivalent to the applicable standard.

To prove a program violation, an ADA/§ 504 plaintiff must establish that a program, service or activity is not readily accessible to and usable by individuals with the disability in question. This will, by necessity, require proving that one or more facilities are inaccessible due to physical barriers and/or architectural barriers, as well as proving that the methods used to compensate are inadequate. Inaccessibility can be proven in the same way as proving a facilities violation except that (i) it need not be shown that the facility is new or altered and (ii) standards like ADAAG are merely advisory.

Thus, both "facilities" violations and "program" violations involve proof of physical and architectural barriers. For a facilities violation, a single barrier or variance from specifications can be adjudicated without regard to other conditions or programs. For program violations, however, such proof alone is insufficient; a plaintiff must also demonstrate that the methods used to compensate are inadequate to allow ready accessibility. In making the ultimate "program" evaluation, we must view the services, programs and activities "in their entirety." In doing this, physical and architectural barriers in all relevant buildings, new or old, may be considered to assess their combined impact.

The foregoing constitutes the law that will govern this case. The sub-issues of terrain issues, structural load-bearing beams, buildings of historical significance, and financial hardship, to the extent they actually arise, will eventually be worked into the basic framework set forth above.

### 6. THE FACTUAL RECORD.

On the instant record, insufficient evidence exists to support plaintiffs' motion for partial summary judgment. Plaintiffs seek summary judgment with respect to 441 purported violations at City College's Ocean Avenue Campus. Of these, 335 relate to conditions at the following six buildings on the Ocean Avenue campus: (1) Louis and Claude Rosenberg Jr. Library, (2) EOPS building, (3) Stadium Press Box, (4) Bungalows Series 500, (5) Bungalows Series 600, and (6) Bungalows Series 700. According to plaintiffs, the 335 conditions each violate both ADAAG and UFAS standards for such new construction. Defendants admit that these six buildings are "new" (Br. 2–3).

Plaintiffs, however, fail to carry their burden with respect to these purported deficiencies. One overarching problem for plaintiffs is that they do not prove the dimensional tolerances for the purported conditions. They do not prove that the variances exceed the dimensional tolerances. (This should not be difficult to show if the violations are as severe as plaintiffs suggest.) Some of the alleged violations, moreover, are measured so as to include temporary obstacles such as chairs or machinery in the calculations. But plaintiffs have not proven that the blockages are persistent. Still more of the conditions attacked by plaintiffs were merely under maintenance. Any assessment on the condition under maintenance may be misleading and the condition may be compliant in the aftermath of such maintenance. Summary judgment as to these 335 conditions, therefore, cannot be granted.

The remaining 106 conditions at issue relate to purportedly non-compliant pathways on the Ocean Avenue Campus. Defendants admit that many of the campus' pathways were altered as part of its barrier-removal construction, which was conducted after January 26, 1992 (Br. 8). The challenged pathways, however, are not sufficiently described by plaintiffs to allow for determination whether they constitute "new" construction. And, plaintiffs have not met their burden with respect to dimensional tolerances for such pathway conditions — what those tolerances are and to what extent the alleged deficiencies exceed such tolerances. On this record, therefore, summary judgment with respect to the pathway conditions cannot be granted.

1    Defendants object, moreover, to all five declarations submitted by plaintiffs in support
2    of their motion. These declarations include three expert witness declarations, a declaration
3    from plaintiffs' counsel and a declaration from a legal assistant working for plaintiffs' counsel.
4    Defendants are correct that these declarations in many places violate FRCP 56(e), which
5    provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall
6    set forth such facts as would be admissible in evidence, and shall show affirmatively that the
7    affiant is competent to testify to the matters stated therein." A law firm legal assistant, for
8    example, includes a chart with her declaration listing the 441 architectural conditions at the
9    Ocean Avenue Campus along with selective quotations from the record and her conclusions
10   about the compliance of such conditions (Becker Decl. Exh. A). While FRE 1006 permits the
11   tabulation of voluminous writings, charts submitted under that section still require foundation
12   and may not contain additional legal argument, legal conclusions or hearsay.

### 7. SECTION 1983 CLAIM.

Finally, defendants move for summary judgment on plaintiffs' Section 1983 claim. The class asserts this claim against the Chancellor and the members of the Board of Trustees in their official capacities. The basis is an alleged deprivation of "rights under Title II of the ADA and Section 504 of the Rehabilitation Act" (Compl. ¶ 61). Defendants argue (1) that Section 1983 claims cannot be predicated on violations of the ADA or the Rehabilitation Act and (2) defendants are immune from suit under Section 1983.

"Section 1983 is broad, providing as a general rule, a mechanism to enforce constitutional or statutory rights." Exceptions exist, however, to the ability to use Section 1983 to vindicate federal rights. *Buckley v. City of Redding, Cal.*, 66 F.3d 188, 190 (9th Cir. 1995) (internal citations omitted). Most importantly here, a plaintiff cannot bring a Section 1983 action if "Congress has foreclosed citizen enforcement in the enactment itself, either explicitly, or implicitly by imbuing it with its own comprehensive remedial scheme." *Ibid*. "A comprehensive remedial scheme for the enforcement of a statutory right creates a presumption that Congress intended to foreclose resort to more general remedial schemes to vindicate that

17

1 right." *Vinson v. Thomas*, 288 F.3d 1145, 1155 (9th Cir. 2002), *cert. denied*, 537 U.S. 1104
2 (2003) (internal citation omitted).

3     Title II of the ADA and Section 504 of the Rehabilitation Act provide such a
4 "comprehensive remedial scheme." *Id*. at 1155–56. In *Vinson*, our circuit agreed with several
5 other circuits that "Congress intended to foreclose resort to the more general enforcement
6 provisions of section 1983 to vindicate the rights created by the Rehabilitation Act." *Id*. at 1156
7 (internal citation omitted). It concluded that the remedial scheme of Title II was so
8 comprehensive as to bar Section 1983 enforcement. The court held, therefore, that plaintiffs
9 could not bring a Section 1983 claim based on the two disability statutes against state officials.

10     The Ninth Circuit only applied its reasoning to suits against officials in their individual
11 capacities. A lingering question from *Vinson*, therefore, is whether the bar on Section 1983
12 claims also applies to suits against officers in their official capacities. This order holds that the
13 official/individual capacity distinction does not alter the preclusive effect of Title II and
14 Section 504. The primary rationale for disallowing the Section 1983 claim in *Vinson* was the
15 comprehensiveness of the ADA and the Rehabilitation Act — they comprise the conclusive
16 statement of Congress on remedies in this area of civil-rights law. The rationale cuts broadly
17 and will be applied here. Moreover, permitting such suits would yield duplicative enforcement.
18 *See Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir. 1999) ("To permit a plaintiff to sue both under
19 the substantive statutes that set forth detailed administrative avenue of redress as well as
20 section 1983 would be duplicative at best; in effect such a holding would provide the plaintiff
21 with two bites at precisely the same apple").

22     Plaintiffs cite *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1189–90 (9th Cir. 2003), for the
23 proposition that such claims are not barred. Plaintiffs, however, confuse the availability of
24 *Ex Parte Young* suits under Title II and Section 504 and the availability of Section 1983 suits
25 premised on the disability statutes. While finding *Ex Parte Young* suits tenable, the
26 *Kitzhaber* court specifically declined to answer the question of official-capacity liability
27 under Section 1983, finding it lacked jurisdiction. *Ibid*. Morever, the lower court in
28 *Kitzhaber* did not confront a Section 1983 claim premised on Title II or Section 504. *Id*. at

18

1190. Instead, the lower court found that the plaintiffs' claim was premised on equal protection and therefore not barred by *Vinson*. *Ibid*. Here, plaintiffs do not and cannot argue that their Section 1983 claim does anything other than restate their ADA and Rehabilitation Act claims. Such a claim is barred. This order need not, therefore, reach defendants' immunity argument.[6]

## CONCLUSION

Except that it will be deemed established that the six buildings named above are "new" under Title II, plaintiffs' motion for summary judgment is **DENIED**. It was submitted on an extreme theory of liability. The Court is under no obligation to rummage through an avalanche of paper to try to connect the dots under the correct standard, even assuming the integrity of the record could be trusted. Moreover, defendants' hearsay objections are largely sustained. Defendants' motion is **DENIED**, as presenting fact questions for the jury, except as to the matters of law set forth above.

**IT IS SO ORDERED.**

Dated: January 12, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[6] Contrary to defendants, Margie Cherry, Estoria's mother, has presented sufficient evidence to warrant a trial as to whether she is a qualified individual with disabilities. This ruling does not vouch for every evidentiary item. For example, that she has a blue card from the state agency is not much proof, given how easy it is to obtain and retain these cards.