United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGIE CHERRY and ESTORIA CHERRY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY COLLEGE OF SAN FRANCISCO ("City College") LAWRENCE WONG, in his official capacity as President of the Board of Trustees, MILTON MARKS, III, in his official capacity as Vice-President of the Board of Trustees, DR. NATALIE BERG, JOHNNIE CARTER, JR., DR. ANITA GRIER, JULIO J. RAMOS, RODEL E. RODIS, in their official capacities as members of the Board of Trustees, and DR. PHILIP R. RAY, JR., in his official capacity as Chancellor,<br><br>Defendants. | No. C 04-04981 WHA<br><br>**NOTICE OF FURTHER HEARING** |

Counsel will please attend a further hearing on the admissibility of the 1993 OCR-City College Settlement Agreement and the 1998 OCR letter at **8 A.M. FRIDAY FEBRUARY 3, 2006**.

Please be prepared to address the following:

1. The agreement references compliance concerns identified in Case No. 09902048. What were the concerns? Won't we have to understand these concerns to grasp the purport of the agreement? Bring the file in Case No. 09902048.

2. The Settlement Agreement called for certain structural modifications.  One was to create "accessible routes . . . to all facilities as provided on the February 27, 1993, Site Accessibility Master Plan."  Did this literally mean "all facilities" or just all referenced in the plan.  Will testimony be necessary to resolve this point?  Bring the plan.

3. What did it mean to call for modifications "consistent with" (as opposed to called for) by the February 22, 1993, Preliminary Design Package?  Bring the package.

4. Did the contingency regarding the $5,506,000 of state money occur or not?  What impact did that have under the agreement and its implementation?

5. Since the agreement was a compromise and the agreement did not constitute an admission, how can it be said that the agreement, even if fully implemented, cured any and all violations?  (Usually, compromises are just that—compromises, each side gets a partial loaf.)

6. With respect to the October 1998 letter, have the college reports relied on been produced (bring them to the hearing)?  Has the Charles Jackson letter been produced?  Has it been shown to be false or incomplete (bring it too)?  Who was the interviewed disabled student and what did he or she say?  What record is there of the conversation?  The same questions regarding the conversation with the college's disabled student services officer.  Did Mr. Jackson ever visit the campus to see for himself?

7. How do plaintiffs wish to use the Settlement Agreement?

8. If plaintiffs wish to use it, why shouldn't defendants be allowed to use the 1998 letter?

9. The Court is tentatively of the view that all of the foregoing sub-issues will burn up a lot of valuable time and prove little.  Be prepared to explain why either side should be allowed to rely on either the Settlement Agreement or the 1998 letter

2

(or why not) and what the narrowest possible use would be to avoid the foregoing sideshows and detours.

10. Read the *Canutillo* decision. Do you really think it holds that "findings" letters like the 1998 letter should come into evidence? Doesn't it merely state that a court should defer to an agency's interpretation of its own regulations?

*         *         *

The Court received a phone call from the Sturdevant Law Firm about the nature and scope of the maps to be provided for trial. We will take this issue up at the above hearing as well.

**IT IS SO ORDERED.**

Dated: February 2, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

3